All right, please be seated and when you're ready, we'll have our... Um... Mr. Chan? Good morning, Your Honors. David Chen for Appellant Cobey LaKemper, and I wanted to introduce our law student advocate, Alessandra Quattrochi, who will be doing the oral argument. Thank you, sir. Quattrochi, it will be a pleasure to hear from you. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court, Alessandra Quattrochi for Appellant, reserving five minutes for rebuttal. As I will demonstrate, the merits of each claim herein turn on disputed material facts, and drawing all reasonable inferences therefrom in plaintiff's favor, even when according defendant's proper deference, it is evident that the district court improvidently granted summary judgment. I'll begin by discussing why the retaliation claim is best suited for decision-making by a fact-finder, then I'll turn to how the district court misinterpreted the scope of the legal speech ban claim, and I will end by discussing the theory of liability implicating Mr. Ishii on the male mismanagement claim. Beginning with that retaliation claim, this court set forth the prima facie case in Martin v. Duffy, and it's a fact-intensive inquiry that makes it such that this decision wasn't primed for summary judgment. We know, for one, that defendants- You're talking about the retaliation in the sense that there was a denial of the plaintiff's special draw? Yes, Your Honor. The denial of the special draw is what we assert constitutes the basis of the retaliation claim, in that it was an adverse action taken by defendants against Mr. Lekemper on account of his exercise of his protected right to litigate against NCDAC. And so while defendants don't contest that he was exercising a constitutional right, they do contest whether that constituted an adverse action, that denial. And we would state that, in fact, it does. Why would this be- I mean, what are we talking about here? We were talking about you permitted to exercise your special draw request because you filed something like 10 more grievances. And in order to file those grievances, you would have had to be able to exercise your special draw. Well, Your Honor, the special draw policy is for an incarcerated person to retrieve funds out of their trust fund account. Well, I understand that, but in order to file these grievances, which seem to be the focus, you would have- The point is, in order to file them, you would have had to exercise the special draw request, and the special draw request would have to be granted. That's correct, isn't it? Your Honor, that's not my understanding of what the special draw request is used for. My understanding would be that the grievance process is entirely distinct, and the special draw request is used for something more akin to buying a magazine from an outside seller or buying books, and in this case, contracting the services of an independent paralegal service. But I take your point that Mr. Lekemper could have, maybe on another request under the special draw policy, received an approval from Defendant Owens, but of course, it's the fact that, in this case, Mr. Owens denied the request because he was alerted to the fact that Mr. Lekemper was using these funds to litigate against the correctional facility. Well, if all these other special draw requests are granted, then where's the retaliation? Well, for one, Your Honor, on the record at page 151, we know that Mr. Lekemper actually wrote that the purpose for this special draw request was to litigate against NCDAC, and there's nothing in the record to suggest that on other special draw requests, he was also litigating against NCDAC. So we know that, for one, Mr. Owens had knowledge of the protected activity. There's a causal relationship in that there's a temporal proximity to the denial and the request. It was almost instantaneous when Mr. Owens chose to deny. But if you're still getting the books, and you're still filing the grievances, and you say there's a good chance that other special draw requests were granted and everything, I mean, I don't really understand where the retaliation is. I don't understand exactly what the retaliation motive would be, because if they were interested in retaliating, what they would want is they would not want these grievances filed against the prison. That's the one that hurts them and pinches them. They don't want to be under the gun with respect to these grievances. And yet, there you are, ten more grievances after the incidents that were complained of here. And I said, if this is retaliation, which I question, it has been woefully ineffective. Your Honor, the retaliation comes from the fact that he denied this request because this request was being used to send funds to a paralegal service that would effectuate his claims against NCDAC. And we don't know, frankly, whether he had subsequent special draw requests that were approved of or denied and what the purpose of those requests were for. What we do know is that Mr. Lekemper, objectively, or someone in Mr. Lekemper's position, could have been chilled on account of the denial of the special draw request. Do you want to address the district court's reasoning? The district court said this was a de minimis inconvenience because he was alerted to the problem with his draw request and he could have corrected that problem and filed another one. That it wouldn't deter a person of ordinary firmness, just like it didn't deter him. Your Honor, yes, to that point, we know that the adverse action standard is a relatively low bar. This court has acknowledged adverse actions and denials of discretionary benefits in Constantine and Suarez. This is much akin to that. And to your latter point about whether he could have resubmitted the special draw request, for one, you know, the retaliation had already come to fruition by that point in that the adverse action had already been taken. And to the latter... Well, his request had been denied, but he had also been told how he could fix it and his lawsuit was still ongoing. Yes, Your Honor. He had been given several justifications that were vague and actually not substantiated by the rules of the policy, which we have on the record, starting at 146. And so it's not clear upon this record that if Mr. Lekemper had resubmitted the special draw, it would have actually been accepted. In fact, on the special draw request... It's not clear it would have been denied. I mean, you know, there's a problem here about the request not even containing proper documentation. And I don't think the question here, you frame it as an adverse action question, but I think the real question is, is there any retaliatory motive? And Judge Rushing points out you've got an obligation here on summary judgment to indicate that there's a genuine issue of material fact. And when you say, well, if we had provided the proper documentation, there's still no guarantee that it would have been granted. But there's still no guarantee it would have ever been denied. So all you had to do was find the proper documentation, and we can see if it's even been denied. And then I'm having problems seeing how this is so retaliatory when this person is off to the races with all of these different grievance proceedings, which he has a perfect right to file, and I don't begrudge him that at all. And he seems to be a very knowledgeable fellow, and so he could have conformed to the procedures here and had the request granted. Your Honor. There would have been no retaliation at all. Your Honor, I would reassert the fact that the retaliation had already come to fruition, but even so, taking your point, again, defendants assert over 11 reasons for why the denial was even made. Hardly any of them actually comport with the text of the written policy. Which is all well and good, but it does have a burden-shifting situation. So he did establish it, but then the burden shifted to Owens, who then comes forth with some non-retaliatory reasons. And when it reaches that burden, the causation element of retaliation is tremendously weak for you, don't you? I mean, you see that, don't you? I mean, it's not just the initial determination in the first instance that, well, retaliation has happened because someone says that you can't do this against DAC. That shifts the burden. And when the burden shifts to Owens, he gave a list, I think, four or so reasons. Once you get that list, then it becomes a basis for the court to make a determination that, hey, this is not sufficient for retaliatory conduct. Yes, Your Honor. And in fact, I would point this court to Judge Wynn's decision in Jones v. Solomon, where defendants did proffer a similar list, several justifications, none of which were really rooted in any written policy. And ultimately, that's what we have before this court today. The list that you reference amounts to nothing more than being probative of the pretext because defendants were otherwise not acting neutrally in denying that special draw request. But seeing as I have limited time before this court today, I'd like to turn to the legal speech ban claim, which is in the record at page 118 and bans assisting with litigation or legal matters. And in so doing, it goes beyond any state in this circuit to ban nondisruptive legal speech among incarcerated people. Is there any prison department in the country that has one like that? I know you don't have one here. Virginia has a rather restraining one, but I don't know of another one that has an absolute ban on it. Or is there? No, Your Honor. In fact, I have read every single disciplinary code across the United States, and we didn't find anything akin to the language here in North Carolina's C-20 policy. And we see that. But the question really goes, is this a right to access First Amendment question, or is it a question of First Amendment on speech? We know it's the latter, Your Honor, pursuant to the district court's order below. And I think it substantiates. And what case, Supreme Court case, supports that the latter is the one that we proceed on, on speech? Well, Your Honor, we know that under Shaw v. Murphy, there's a right at least to have the Turner test applied to communications among incarcerated people about legal natures or legal matters. And so I would point this court to that decision, as well as to Turner itself, which, of course, involves just generally intra-inmate communications. But to evaluate it, at least in this context, we turn to Turner. And there are factors under there to consider. And as we consider those factors, that first one is particularly interesting. Elucidate on that. Yes, absolutely, Your Honor. The first Turner factor is ultimately the touchstone of the test. And here we see no real logical connection between defendants' purported penological aims and the policy as it is written. But we give a lot of deference to the Department of Corrections. Yes, Your Honor. But the deference is actually just baked into how that Turner test operates. Of course, that's why we only apply Turner in the carceral context. Well, I don't know how we get around our earlier decision in Capital Association v. Stein. And as that said, an authorized practice of law was a perfectly constitutional enactment. And we have also the part of the Turner test is the rationale and the strength of the state's interest with respect to the particular regulation involved. And when you look at the Supreme Court's decisions in Shaw, and I think that it's really important to follow that, you have a situation where the Supreme Court is pointing out that the prison law clerks can be detrimental to prison discipline and that they could set in motion a situation where in order to receive legal assistance, one has to fork over contraband of a certain nature. And in addition, there's a question of whether the legal assistance is a badly erroneous advice, which could prejudice the individual who receives the legal assistance if it's bad advice. And so what North Carolina has done is they have set up alternatives. And the alternative is that the North Carolina prison legal services, they can communicate with licensed attorneys, can communicate with a number outside the prison environment. So given the Supreme Court's cases and the dangers that they have pointed to with unregulated or unsupervised legal assistance within the institution, and given the state's interest, which seems to be significant, and given the deference that Turner requires, and given the alternatives that North Carolina has taken pains to enact, and given our earlier decision in Capital Association versus Stein, I don't understand how we can overturn this kind of an enactment. It seems that North Carolina has dotted its I's and crossed its T's. Your Honor, we would disagree definitely with that latter proposition. I see my time is about to expire, and I'd like to briefly respond to your question, if I may. To the first point, plaintiff has never challenged this policy insofar as it bans litigation assistance. So the Capital Association's case is frankly not in dispute and quite irrelevant to the challenge before this court because Mr. Lekemper is not asserting a right to provide litigation assistance to his peers. Instead, he's arguing he has a right to receive legal information akin to asking— The policy says it prohibits prisoners assisting another person with litigation or legal matters. Yes, Your Honor. So it does ban assistance with litigation. Yes, it does, and we don't challenge that aspect of the policy. Instead, Your Honor, we're challenging the overbroad implication by the ban on the assistance with legal matters, which is substantiated by how it's been enforced against Mr. Lekemper on four separate occasions. So are we going to get into a lengthy stream of litigation over what's legal matters and what's not? I mean, it seems to me this sets up a lengthy stream of lawsuits, which draws us into the minutia of prison litigation that the Supreme Court has told us to be wary of. We would disagree that that would be a concern, Your Honor, because, of course, if defendants are able to posit that this policy only extends to banning litigation and the provision of legal services, which the policy otherwise accounts for in banning all violations of statutory code in North Carolina, then we wouldn't be here before this Court today. What we're concerned about is an overbroad application of the policy against Mr. Lekemper. We're going to be litigating until the cows come home with respect to what is assistance with litigation and what is not. And that can be a very fuzzy line to draw. And as a result, it seems to me that the interpretation and enforcement of this particular policy is going to lead us into the kind of minute administration of day-to-day prison administration that the Supreme Court has told us to be a little bit cautious of. Your Honor, we don't foresee that happening before this Court. Instead, I think what would be more likely is that prison officials will have to make the call on what constitutes litigation assistance or legal matters, but there's nothing in the record to suggest they're not fully equipped to do so. You know, the simple answer is no other state has it, no other one has it, and that has not happened. That's really your simple answer. Yes, Your Honor. You're going back and forth on this, but nobody else is doing it, and none of that is happening. So that sort of ends it. Exactly, Your Honor. What's the evidence in the record about what's happening in the other states? As far as terrible consequences. Your Honor, there's no evidence in the record about any of it. Whose burden is it to put in evidence showing what would happen if North Carolina didn't have this policy? Perhaps plaintiff's burden, Your Honor, but, of course, we weren't counsel of record for plaintiff at the lower court. He was proceeding pro se and had very limited discovery. I guess I thought you were challenging the policy as it's written, but it seems like you just said we're not challenging, or Mr. Lekemper's not challenging, the prohibition on assisting others with litigation. Is that right? Yes, Your Honor. We fully concede that UPL is a valuable or rather rational policy for defendants to have, but anything beyond that is where we get into the weeds of an overbreadth concern. So you're acknowledging that under the first Turner factor, the state has a legitimate policy, it has a legitimate reason for the policy, and banning assisting others with litigation is a legitimate way to go about enforcing or protecting that state interest. Your Honor, the dispute there would be that defendants already have a policy outside of C20 that bans UPL. Well, they don't. They don't. They have. You say it's illegal in North Carolina for anyone to engage in the unauthorized practice of law, but let's assume your average prisoner may not know everything in the North Carolina Code, and it might be helpful to have an additional policy that sets out, hey, you're prohibited from assisting each other with litigation, right? So I take your point that anything that is on top of North Carolina law is in a sense duplicative, but surely saying you're prohibited from having controlled substances, for example. Duplicative of North Carolina law. No one can have them even outside of the prison, but totally rational for the prison to have this additional policy. So it seemed to me just now that you're acknowledging there is a legitimate state concern and that this is a policy prohibiting assisting each other with litigation is a legitimate way of going about it. Your Honor, respectfully, no on the latter point, and that defendants would be better positioned to simply write the policy, as you suggest, to prohibit assisting with litigation. But it goes further than that. So your objection is just to this or legal matters? Yes, Your Honor, and especially in how it is being enforced against Mr. Lekemper and his peers. So the deference that we owe to the state and its ability to kind of take a wide berth when it's dealing with a problem, you say wouldn't cover that legal matters. It only covers litigation, and they can't kind of make sure they're covering all their bases by including or legal matters. That's the heart of your constitutional challenge. Yes, Your Honor, in covering just legal matters, we're banning speech that is non-disruptive, that's plainly protected by this court and the Supreme Court, and ultimately undermines the legitimacy of institutions where Mr. Lekemper would otherwise, in his carceral facility, be able to turn to a peer and ask about Judge Wynn's decision in Jones v. Solomon, for example. The problem is it doesn't just ban unauthorized practice of the law. You can't even discuss it. Yes, Your Honor. You can't talk about it. You can't even talk to them about it. You can't look at an affidavit or something and say it's okay. I mean, it's the broadest policy out there. Precisely, Your Honor. This is not a policy about unauthorized practice of law. That's already something you can't do. I mean, that's just an illegal thing to do. We lawyers kind of like that. But that's the problem you've got here is no one has a policy like North Carolina. I don't know. I didn't even know it myself you had such a thing in there. I mean, you can't talk about it. That's rather broad. Right, Your Honor. And it leads to quite absurd implications. Is that the policy? The policy says assist each other with litigation or legal matters. Yes, Your Honor. And in practice, we know that that goes as far as banning simply sharing legal information, quote, unquote. There's a number of declarations in the record from other prisoners who are supporting the plaintiff in this litigation. And they were able to talk about this case and write those declarations and file them in supporting him in his litigation, right? Well, Your Honor, we actually have accounts from many of those peers, as well as Mr. Lekemper himself, that they were knowingly violating policy when doing so, that they were having to camouflage their writing of that affidavit so as to not be subject to punishment by defendants. And that, in fact, it was overall constituting anxiety and a chilling effect, what we know to be indicative of a First Amendment concern. And that's what Mr. Lekemper had to go through even to successfully mount this claim in the district court. Was that because of actions of the defendants? Absolutely, Your Honor. So someone in the prison was telling them they could not assist with this litigation? Where is that in the record? No, Your Honor, apologies. There's no one, or rather, there's no record that someone said you couldn't fill out this affidavit. But what we do have are several accounts of prison administrators saying to stop talking about legal information, to shut up, to, against Mr. Lekemper, again, on four separate occasions, he was forced to perform. But that wasn't any of these defendants, right? And that's not the policy. The policy is assisting with litigation or legal matters. Your Honor's, or rather, Your Honor, that is the policy would be assisting with legal matters is what Mr. Lekemper is doing when he's asking someone to talk about any case. Say, again, the decision in this very case, if Mr. Lekemper were to want to just generally speak about its significance, he would be punished. As a practical matter, assisting with legal matters would very often include assistance with litigation. Your Honor, there may be some blurring of the lines. And so we're going to be, if that's true, that assistance with legal matters would be often assisting of litigation, Are we going to spend an indefinite number of lawsuits deciding what part of the line this falls on and what this particular matter of assistance was legitimate and this other matter of legal assistance was not? We are bequeathing a perfect hornet's nest to prison administrators and denying them the deference and the marginal birth that Turner requires. And we're going to be caught up in line drawing matters about what was actually assistance with litigation and what was assistance with legal matters that didn't involve litigation and could this have involved litigation and this and that, and we've been making decisions that are not ours to make. At any rate, we've given you a whole lot of extra time. Yes, Your Honor. Why don't you reserve some of that for rebuttal unless my colleagues have additional questions. Thank you, Your Honor. Thank you. Mr. Wray.  Your Honors, may it please the Court. Tanner Wray with the North Carolina Department of Justice on behalf of defendant Appelese. We respectfully request this Court affirm the District Court's grant of summary judgment in this case for the following three reasons. First, Mr. Lekemper failed to fully exhaust his administrative remedies prior to filing a suit on the issue of the legal assistance policy. And even if he were to have fully exhausted those remedies, Mr. Lekemper does not possess the First Amendment right to act as a lawyer on behalf of his fellow inmates, which is all that the policy prohibits. Where'd you get that from? I'm sorry, Your Honor? Where'd you get that from, that it just says he can't act as a lawyer? Well, that's simply in the definition of what constitutes legal assistance. Tell me what the policy says. Certainly, that's on. The policy is limited to him practicing as a lawyer. No, it doesn't say it's limiting practicing as a lawyer, Your Honor. The policy on page 140 specifically says prohibiting assistance with litigation and legal matters. Which means legal matters, what's that? Legal matters would be synonymous with what the UPL refers to as legal work. So if you talk about a case that was at this court with someone, is that assisting with a legal work? No, Your Honor, no. It really isn't? Maybe not for a lawyer, but what about, this is not written for lawyers, this is written by prison officials. Is there not any evidence in the record of how it actually has been applied there? In a way, no, not formally, Your Honor. What about the informal way, then? Mr. Lekemper alleges on page 390 of the record that there were at least four correctional officers involved in chilling his legal effects. None of those are defendants in this action, and to the extent that Mr. Lekemper would seek maybe the allegations go to what the effect of what this is by him saying that the correctional officers did this. He's challenging the policy. So what were the specific allegations that he made? So the specific allegations, Judge Winn, is that Mr. Lekemper is feeling that he can't, as you say, simply talk about these legal issues.  Yes, his speech is being chilled. Yes, which is too broad of an interpretation for what the policy actually prohibits. So North Carolina has this policy. Nobody else has anything like it, or do they? Not that we're aware of, Your Honor. As we understand, North Carolina has this policy, just as it has many other policies that prohibit other law. How much broader is it, then? Do other states allow them to? I mean, there are states that say you can't actually act as a lawyer, or you can assist. In other words, there's a very narrow interpretation it seems our court may want to take from this, and you want to take from it. But there are policies that say that. This does not say that. This is a broad statute, a broad policy being interpreted by labor on a daily basis of what they can do. So if you start talking about legal matters, you do run into the problem that Judge Wilkerson alludes to. It puts before us every time someone says, I can't assist, or I'm not assisting, because you just identified an instance of assisting. So if he does that, that's litigation. Because we don't know what they're talking about when you see a listing in legal matters. I mean, where is the limiting principle to this policy? What is it? I mean, what does it mean? The boundaries of the legal assistance policy extend no farther than what is already prohibited by the unauthorized practice of law statute in North Carolina. And the proof of that is in that the wording of the legal assistance policy is almost synonymous with the wording of the prohibition on ‑‑ But it doesn't address specifically unauthorized practice of law, which is a term of art by the bar. It goes to just generically say you can't assist in legal matters. And assist is a very broad term, regardless of how narrow we want it to be in this instance, whether the challenge is as applied on the face in terms of the constitutionality, assist is a lot of things. And I mean, no one else has a policy like that. It's interesting, Your Honor, that the unauthorized practice of law statute, section 84‑4 of the general statutes, uses that exact same word, assist. You know, no matter how this policy was drawn and no matter what it said, there's going to be litigation over it. And the question is, they say, oh, well, we can just eliminate on legal matters and we will have a correct policy because it comes to another person's assistance with litigation. Well, assistance with litigation is going to ‑‑ that phrase itself is going to breed litigation. Because it's not altogether clear in my mind exactly what assistance with litigation is and what it is not. You know, that's not going to be clear. There is no policy you can draw that would not have some dispute over the terms. And the question is under Turner and subsequent cases which are leery of inmate legal assistance and the possibilities of abuse in terms of it being a bartering mechanism for contraband. And the question here is, and they're putting this in terms of litigation, legal matters, First Amendment rights. The question here is, there is no policy that is not going to breed litigation over the prison's application of it. None. And you don't eliminate any of that uncertainty or litigiousness simply by saying, or legal matters. It's still going to be litigious and the question is, I think, under Turner and Shaw and Johnson, who makes the decisions? Do the courts going to make all those decisions? Or do we allow under our federal system a certain degree of latitude in administering this whole area to the North Carolina officials who are charged under our federal system and Turner and others with primary responsibility here? Because there's no magic bullet to keep litigation out of any regulation, of any regulation of this practice. And there's no perfect policy that can be drawn. And if that is the case, then who gets to implement and make these day-to-day administrative decisions? The courts or the prison system? And those are reasonable questions, Your Honor. And to the extent that correctional officers themselves may be misapplying this policy to inmates, the inmates themselves would then have an opportunity to litigate that matter against those individuals in their individual capacity. But is any of that true with regard to Virginia, South Carolina, Maryland, and West Virginia? I mean, in terms of how wild it's going to be to not let them have this policy, all this litigiousness is going to happen? If it would seem plausible to me if everybody else had it and North Carolina didn't or wanted, then maybe there's something to be said there. But we already have the test that there's no such thing as you're going to have a big problem with not having this policy in place when North Carolina is the only state that has it, at least in this circuit and probably in this country. But I don't know about the country, but certainly in the circuit. So I'm not following the problems with addressing the fact, the broadness of this policy in a reasonable way to say, you know, we don't need to go to the Fourth Circuit and say, well, assistance is going to be limited to this. Maybe if we wrote something like this, that this policy can only be interpreted in this way, well, we're essentially writing a policy for them. I mean, we can, I guess. And then once you do it, you really have created a litigation situation because once we say assistance can only mean unauthorized practice or dealing in litigation, then when something else happens, we have just opened ourselves up to litigation. In my opinion, quite what Judge Wilkinson described, not doing it opens litigation. So I, you know, we can go back and forth on this, but that at least is the perspective being is there's not something wild being asked here. No one does it but North Carolina. So then you look at it and you see these things are happening and you say, wait a minute, you can't even talk about it. Because talking about a legal case in and of itself is assisting, particularly if you are talking about their case. That's common sense. I mean, you can look that all over. That's already there. And that's the language that's used here. These are not lawyers or the bar association determined that the sanctions for that is you can't practice unauthorized law. You didn't have a bar type thing. This is internal prison settings where individuals, this alternative basis of being able to get some help, they don't have any money. There's a limitation on how much prison legal services can help you there. A lot of them have shared type situations. Probably one of the best principles for knowing about legal stuff might be there because they all have criminal issues. They've all had trials. And they can't even talk about it. You can't even discuss what's going on with cases here or saying, well, in your case, it seems very similar to my case. And I had this happen in my case and you had it there, but I don't understand it. And then you say, I did this. That's assistance. And you've got a problem there. So it's a very broad policy. And we can talk ad nauseum about all the horrors that can happen to it, but it comes down to in every case we come, we get to, we don't narrow interpretations like this. We don't do this. We don't look at assistance and say, well, that just means this specific type of assistance, and that's it. If we do, that's all well and good, but we need to do it in every case. And so I think this is much broader than what is being represented here today. But if you think not, you are now invited to respond. And I do not, Your Honor. And there are certainly many procedural landmines associated with the court and separation of powers issues, but this court doesn't need to get to that. Simply, the court needs to address the exhaustion issue. The question here is whether North Carolina can act prophylactically. And it is a very broad step to say that there's no avenue of prophylactics that is open to North Carolina. North Carolina can take cognizance of the fact that the Supreme Court has said that there are dangers with this kind of prison assistance. In other words, in return for discussion of this or discussion of that, I want some kind of contraband or whatever. And the question is, North Carolina can take cognizance of those dangers and act prophylactically to try to prevent them. And the Supreme Court has pointed out the dangers of it. And the question is whether we're going to yank the leash so tight, so tight, that North Carolina cannot act preventively and prophylactically to head off some of the dangers that it sees within its system. And the idea that North Carolina cannot be by itself, innumerable justices have said that an individual state by itself can enact a policy. And in many cases, that's what the laboratory experimentation at the heart of our federalism is all about. And if every state was required to conform specifically and precisely to every other state, we'd have no federal system. And the question is whether under Turner, North Carolina can head off dangers that it not unreasonably perceives. That's correct, Your Honor. And we've seen instances in which inmates have. Is it correct if you're saying dangerous, and you're just saying it, but they're dangerous, there's all kinds of extortion things can go on, but nobody else has it, and there's no evidence put in this record to show, which the burden in terms of being able to get that first term of action, is you need, it needs to come forth and say these things are happening. Not just we are protecting ourselves from security, we're going to, you're dangerous that are going to happen from this. There's a lot of conclusions, but there's no evidence. And the fact that there's no evidence even within North Carolina, yes, the state could bring evidence for itself to say we're not like Virginia, we're not like South Carolina, we're not like West Virginia, we're not like Maryland, we have extra consideration. That's there, but that's not in the record. And there is no evidence, no indication that these horrors have occurred in states that do not have this policy. It's made up. There's nothing there. It's something you want to say, and it sounds good. It's very conclusory that there are horrors that will happen, and it's like contraband. This is not contraband. This is just discussing a legal case, and no other state has it, and those horrors have not occurred there. So how is it that North Carolina is so unique that the state of Virginia, state of South Carolina, state of West Virginia and Maryland, they haven't enacted a policy like this because they, there's no horrors. If it is, who knows of it? Where's the evidence of it? But North Carolina could have it to itself, but what is the evidence that North Carolina presented that there are such horrors beyond perceived and perhaps and could be? Where is it coming from? I mean, what is it? And as the U.S. Supreme Court case of Thornburg made clear, Your Honor, that under the Turner test, North Carolina is not required to offer some issue that it's had with. It can simply say it, is what you're saying. When we're talking about evidence, there's no evidence that these problems don't exist, and we don't have a telescope into what's going on within prisons, and there's no evidence that this parade of horribles has marched forward, but there's no evidence that these problems are not problems within a prison system, because we're not familiar. That's the whole point. We're not familiar with the administrative problems that prison officials are familiar with, and I do not like the interpretation that our federal system prohibits a state from going its own way and experimenting with what is best for it. Our states are unique. They have the right to adapt policies that they perceive to be tailored to their specific situations, and time after time, the justices have, the Supreme Court, including some of the most eminent members of it, have said that one state is not obliged to act in conformity with all others, and that's at the heart of our federal system, and the question is very simple whether we've provided a certain deference to prison officials and the executive branch in these kinds of situations or whether we don't, and I can promise you that no policy is going to be foolproof no matter how much you try to make it so. Yes, Your Honor, and that's a great deference that should be afforded to prison administrators, and briefly, on the issue of retaliation. But it's a constitutional issue, and the Supreme Court has said that prisoners have a constitutional right to speech. That's the problem you've got. It's not a federal state issue. It's the Constitution. We are all under the United States Constitution, and that is the question to us, not trying to see which state can do this. We've got all kinds of stuff that's going on that's taking power away from states. I agree. We've got some problems there, but this is not such a case. This case is a constitutional issue, and the issue here deals with the broadness of this and whether it infringes on speech, whether it's content-based, whether there's something here that is beyond the scope of it, and while it doesn't, there's nothing that says these problems don't exist. That's not the way to fulfill a burden. There's nothing to say that asteroids don't fall on this place every day, too, but that doesn't make asteroids that fall on it. There's nothing in the other states, and if it had been, what common sense would tell you, if these problems were of such a mammoth proportion in other states, they would enact. I don't agree with that. He's talking about you have a constitutional right, you have a constitutional right to speak, and those same constitutional rights to speech and First Amendment rights were brought up in the Capital Association case versus Stein. They said when you prohibit the unauthorized practice of law, you are prohibiting our right to speak and to speak about litigation and to practice law, and they're saying that that is the right to speak, and those speech claims have been rejected, and that was what was raised in all of the, the speech claims were raised in all of the unauthorized practice cases, and that when one is in prison, there are certain rights that are curtailed, and they have to do with receipt of mail, monitoring of mail, and all the rest, and those rights do not exist inside prison walls to the fullest extent that they exist outside of prison walls. That's been proven in context after context after context. That's right, Your Honor, and inmates necessarily forfeit certain liberties by being incarcerated, and I see that my time has expired. The two of you probably had the easiest job of arguing the case. Judge Wilkins and I had a very friendly, it was a very friendly and collegial conversation on this, and I do disagree with the way in which he's put it, but it is an agreement to disagree not to be disagreeable, just to be clear in terms of what we've undertaken today, but we go back and forth on interesting cases like this. This is an interesting case that presents these interesting facts for which interesting law comes from. I just hate to admit it, but he's a heck of a good guy. It does pain me. We work together. It does pain me to say that, but I love the guy. Thank you, Your Honor. We ask that you affirm. All right. Thank you. You have some rebuttal time, Ms. Petrocci. Yes, Your Honor. Two quick points on rebuttal. For one, defendant only now concedes that this policy only extends to the unauthorized practice of law. That's patently a brand-new position that wasn't proffered in any lower court or in the litigation prior to this point, but if defendants are willing to suggest that this policy can only be said to apply against the unauthorized practice of law, then, again, plaintiff has no problem with that policy. We would ask this court to write an opinion and say, well, this policy is very narrow. We're going to rewrite this and say this is just unauthorized practice of law and define what that is, and you'd probably be happy with that. Yes, Your Honor. But that's not their policy. It would be our opinion. Well, Your Honor, that's not their policy as we read it or have been reading it, but, of course, defendant has just proffered that that is their policy. Well, has there ever been any case that's been brought because someone is simply discussing a legal matter that is unrelated to litigation? Your Honor, this is that case, I think, in that Mr. Lekemper was someone who was discussing legal matters unrelated to litigation and has been on several occasions punished for it. So if defendants want to suggest that – I'm going to have to see the record on that point. Yes, Your Honor. It's on page 390 in Mr. Lekemper's declaration as well as in the complaint on page 24. His disciplinary history did not include any citations for violating this policy. He seemed to declare maybe he was threatened with discipline for violating the policy, but he was never actually cited for violating this policy, was he? Yes, Your Honor. He was never formally cited, but he was otherwise punished and also threatened with formal citations if he were to continue engaging in this behavior. So there hasn't been a conclusion by any prison official that he has actually violated this policy? Well, Your Honor, I would disagree. So insofar as Mr. Lekemper has been cited for – or rather punished for discussing legal matters, and that was the result of a conclusion by a CO stating that that's the conduct he was engaging in that was prohibited. You've raised this as a facial challenge, have you not? Your Honor, we raise it both facial and as applied. Well, it might be more persuasive if you had – I know you say, well, no, this case is an example of that, but it might be more specific – it might be more persuasive to me if the case that was brought had a concrete example of someone who suffered some sort of sanction or whatever. I mean, you say, well, he did, but it would be, I think, more persuasive if I saw someone who had just discussed legal matters and the case was brought against them for legal matters unrelated to litigation. I'm not sure that what you're saying is in general – what you're saying is in general terms, but I haven't seen the as applied challenge fleshed out. I've seen it mostly – most of the firepower has been directed here on the facial attack, and the as applied challenge aspect of it has been very fuzzy and not sketched out. And what I'm saying is that it might be more persuasive if there were an as applied challenge that had a certain amount of tangibility to it. Your Honor, I think that tangibility comes in the record at page 390 and from pages 395 through 418, where we see specific instances referenced. I would also remind this Court that Mr. Lekemper proceeded pro se in the District Court, and I would emphasize your point, Your Honor, that there is substantial concern over, at the very least, the facial challenge to this policy. And as Judge Wynn pointed out, this goes, again, beyond the unauthorized practice of law. If defendants are willing to concede otherwise, then we would ask this Court to issue a declaration to that point such that the as applied concerns that Mr. Lekemper has faced won't, again, come to fruition. Because, again, there's a constitutional right at issue here for Mr. Lekemper to discuss matters of a legal nature that are non-disruptive with his peers and to receive legal information. Well, I understand it. I mean, during the course of oral argument, he's made the very statement that you want him to make, that this is limited to the unauthorized practice of law. Your Honor, but he hasn't applied the policy that way against Mr. Lekemper or his peers. So we would instruct this Court, or rather ask this Court, to offer an instruction to defendants such that they can't continue to punish this kind of behavior that actually benefits carceral facilities by sharing legal information that's valuable for incarcerated people to have. And we ask this Court to reverse. Thank you. Thank you, and I would like to tell you that the Court appreciates your services, and I think you've done a fine job. Thank you, Judge Wilkinson. And we're glad to have you here. I appreciate it. Thank you, Your Honor. And I'm sorry we didn't give you a whole lot of time to argue, but we appreciate you being here nonetheless. It's a pleasure to have you. We'll adjourn Court, and we'll come down and recount. Thank you so much. This Honorable Court stands adjourned until tomorrow morning. God save the United States and this Honorable Court.
judges: J. Harvie Wilkinson III, James Andrew Wynn, Allison J. Rushing